In the

# United States Court of Appeals

## For the Seventh Circuit

───────────────

No. 19-2225

DARRYL TURNER,

*Plaintiff-Appellant,*

*v.*

REENA D. PAUL, *et al.,*

*Defendants-Appellees.*

───────────────

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17 C 2434 — **Matthew F. Kennelly**, *Judge.*

───────────────

ARGUED FEBRUARY 19, 2020 — DECIDED MARCH 26, 2020

───────────────

Before WOOD, *Chief Judge,* and FLAUM and RIPPLE, *Circuit Judges.*

WOOD, *Chief Judge.* Darryl Turner suffered a broken nose during an altercation with another inmate while in pre-trial detention at the Cook County Jail. The injury left him with pain and shortness of breath. A doctor determined that he needed surgery to treat his problems, but to Turner's great

frustration, the surgery was repeatedly rescheduled and post-poned. Over a year after the initial injury, he finally received the surgery following his release from custody.

Claiming that his treatment was unconstitutionally defi-cient under the Eighth and Fourteenth Amendments to the U.S. Constitution, Turner sued a number of administrators and medical professionals at the Cook County Health and Hospitals System and at Cermak Health Services, a county-operated clinic located in the jail. He also sued Cook County itself. The district court granted summary judgment with re-spect to all defendants, and Turner appealed. We affirm the district court's grant of summary judgment.

# I

## A

In October 2015, while Turner was in pre-trial detention, another inmate punched him in the face and broke his nose during a fight. A few days later, he saw an ear, nose and throat (ENT) specialist at Cermak's urgent care clinic. The doctor recommended that Turner follow up with the plastic surgery clinic at Stroger Hospital for a nasal fracture evaluation. On November 10, Dr. Stefan Szczerba (an assistant clinical pro-fessor of surgery at Stroger) determined that Turner needed a septorhinoplasty and turbinate reduction to treat the nose, but he noted that the surgery should wait for six to twelve months, until after Turner's bone injury had healed and the swelling in his nose had subsided. Szczerba scheduled Turner for pre-operation clearance on November 19.

On November 19, Dr. Reena Paul saw Turner at Cermak. She noted that he had missed his pre-operation appointment, and so she contacted the scheduling department to make sure

he got another appointment. This effort was successful. Turner's pre-operation clearance was rescheduled and he was seen for that purpose the next day. Soon after, Turner had an appointment with Dr. Stamatia Richardson, who scheduled him for another appointment on January 12, 2016.

As these events transpired, Turner appeared in state court twice, first on November 9 and second on December 14. On each of these occasions, Turner complained that his nose was broken and that he had not been treated. On both occasions, the judge issued orders requiring that a doctor see Turner. At the December 14 hearing, Turner misleadingly claimed that his surgery had been scheduled for November 9 or 10 and that it had been cancelled. The judge ordered that Turner "should be seen by an ENT as soon as possible and that any surgery that is needed be performed as soon as possible." The Department of Corrections forwarded these orders to Dr. Connie Mennella, chair of correctional health at Cermak, and to Sandra Navarro, deputy director of risk management at the Cook County Health and Hospitals system.

On December 22, Turner's attorney sent a letter to Nneka Jones Tapia, the executive director of the Cook County Department of Corrections, demanding that Turner receive surgery. Jones Tapia forwarded the letter to Elizabeth Feldman, division chair for clinic operations at Cermak, and to Navarro. Navarro and Feldman followed up on the letter with administrators at Stroger Hospital and ascertained that Turner had another appointment scheduled for January 12.

Turner saw Dr. Szczerba again at his January 12 appointment. Szczerba recommended that Turner return in one to two weeks to evaluate the timing of his surgery. The doctor

also wrote in his notes "unclear why so delayed in scheduling." At a deposition, Szczerba testified that this referred to Turner; that is, Turner was unclear why it was taking so long for him to get the surgery. Dr. Paul saw Turner the next day and noted that his appointment with plastic surgery would take place the following week.

On January 19, Michael Gart, a medical resident, saw Turner and scheduled him for surgery on January 21. However, Gart cancelled the operation after consulting with Szczerba, who believed that it should wait on account of Turner's continuing complaints of nasal pain. Turner was rescheduled for a follow-up appointment on February 9. On February 2, Turner's attorney lodged another complaint with Cook County's administrators. Navarro followed up on the complaint and learned of the February 9 appointment.

At the February 9 appointment, the clinic scheduled Turner's surgery for February 25. This surgery was cancelled, but the record does not reveal why. Deposition testimony indicates, however, that when a surgery does not take place it is usually because the surgeon rescheduled or because another patient had a more urgent case. A medical resident rescheduled Turner's operation for March 31. On March 22, Gina Chung, a physician's assistant, saw Turner. Chung observed in her notes that Turner's nasal fracture was not acute and that he was breathing normally.

Turner's March 31 surgery was also cancelled, for reasons unknown. On April 25, Turner had a follow-up appointment where the physician noted that his surgery had been cancelled. In June, Turner was moved from pre-trial detention to imprisonment at the Stateville Correctional Center. In August,

he was released from prison and in November, he received his septorhinoplasty and turbinate reduction at Cermak.

## B

After he finally managed to have his surgery, Turner sued nine administrators and medical professionals who had worked on his case over the preceding year. As the case developed, Turner and the defendants stipulated to the dismissal of three of the defendants, leaving Feldman, Mennella, Navarro, Paul, Richardson, and Chung in the case. Turner also sued Cook County under a *Monell* theory of liability.

After discovery, the district court granted summary judgment in favor of the defendants. It found that Turner had not introduced enough evidence to permit a reasonable jury to conclude that any of the individual defendants acted objectively unreasonably in Turner's case. Because none of the individual defendants had the authority to schedule surgeries, the court reasoned, Turner could not prove that any of them engaged in objectively unreasonable conduct that caused his surgery to be delayed. The court also granted summary judgment to Cook County, on the ground that there was no evidence that the County's practices or policies caused his injury.

## II

### A

At all times relevant to this lawsuit, Turner was a pre-trial detainee. His section 1983 claim against Cook County's doctors and administrators is thus analyzed under the Fourteenth Amendment, rather than under the Eighth Amendment standard applied to prisoners. See *Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). For a pre-trial detainee to prevail

on a claim of deficient medical treatment, he must demonstrate two things. First, he must show that the defendants acted "purposefully, knowingly, or … recklessly." *Id*. at 353. A showing of only "negligence or even gross negligence will not suffice" to meet this standard. *McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018). Second, he must proffer evidence showing that the course of treatment he received was "objectively unreasonable." *Id*. at 886 ("This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided medical care and to gauge objectively - without regard to any subjective belief held by the individual - whether the response was reasonable.").

Turner has not met these burdens. His basic theory of liability against all six defendants is that they failed to ensure that he received his surgery in a timely manner. But Turner presented no evidence that would allow the trier of fact to conclude that the allegedly unreasonable conduct of any of the named defendants caused his surgery to be delayed. The unrebutted evidence showed that none of the defendants had the authority to schedule or to perform the relevant surgery. Additionally, the evidence shows that each time any of the individual defendants encountered Turner, his surgery or another appointment was on the plastic surgery schedule. As a result, a reasonable jury could not conclude that the defendants' conduct was objectively unreasonable.

Taking a closer look, we see that Turner proceeds against two categories of individual defendants. First, he sues Paul, Richardson, and Chung, each of whom served as his primary care physician at some point. Each of the medical defendants

was a primary care provider who could refer him to the plastic surgery clinic for additional treatment, but none was authorized to perform nasal surgeries. Second, he sues Mennella, Feldman, and Navarro, administrators who worked on his case. It is undisputed that none of these defendants was employed at Stroger Hospital and none had the direct authority to schedule operations at the plastic surgery clinic.

Turner claims nonetheless that the medical defendants failed to meet the standard of care by failing to follow up with the plastic surgery clinic to make sure that he had received his surgery. This argument fails. The medical defendants contacted the plastic surgery clinic for scheduling each time they saw Turner. According to the unrebutted evidence, none of these defendants had the independent authority to schedule surgeries at the plastic surgery clinic. That duty fell instead on the medical residents at the clinic, who made their decisions in consultation with the doctors at the hospital. Because the medical defendants had no control over the scheduling of the appointments, Turner cannot claim that their failure to schedule him for surgery, or their failure to nag the residents, constituted objectively unreasonable conduct. See *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (holding that summary judgment in favor of a defendant doctor was warranted where the plaintiff "presented no evidence that … delays were even within [the doctor's] control"). We are aware of no rule of law that would impose a duty on the medical defendants to continue calling the clinic, after they had properly contacted the proper schedulers.

As for the defendant administrators, Feldman, Mennella, and Navarro, Turner has likewise failed to show that their

conduct was objectively unreasonable. Like the medical defendants, the administrative defendants had no authority to schedule surgeries themselves. In each instance where they were contacted about Turner's case, they followed up with the clinic and saw that he had another appointment scheduled, either to see a doctor or to have the surgery performed. Turner charges that the administrative defendants had an additional duty to follow up on his appointments at the hospital to ensure that he actually received his surgery. Once again, we are aware of nothing that places the bar of "objectively reasonable" behavior that high. The administrators' responsibility was satisfied by their follow-ups with the clinic.

Because Turner has not presented evidence sufficient for a reasonable juror to conclude that any of the individual defendants' actions were objectively unreasonable, we affirm the district court's grant of summary judgment in their favor.

B

We now turn to Turner's claim against Cook County. In order to prevail on a claim against a municipality under section 1983, a plaintiff must show that "an official policy, widespread custom, or action by an official with policy-making authority was the moving force behind a constitutional injury." *McCann*, 909 F.3d at 888 (cleaned up). The central question under *Monell* is "always whether an official policy, however expressed[,] … caused the constitutional deprivation." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017).

Turner offers three theories of *Monell* liability against Cook County. First, he argues that the County had a widespread practice of failing to follow through on scheduling. Second, he argues that the County failed to have adequate procedures

in place for responding to court orders and grievance requests. Finally, he argues that Drs. Mennella and Feldman were final policymakers and that their actions caused his constitutional deprivation.

Turner's argument that the County's alleged policy of failing to follow up delayed his treatment fails on its face. Because there was no evidence that the physicians at Cermak had any part in scheduling surgery, the evidence does not support a finding that the County is liable for the delay. Turner points to a report prepared by a court-appointed monitor that found that Cermak failed to enter orders received from off-site clinics in a consistent manner. He cannot base his theory of liability on this "policy," however, because the report covered only orders that Cermak received from the specialty clinics, rather than orders from Cermak to the clinics. The report provides no evidence that Cermak was deficient in requesting appointments for its patients at the specialty clinics. The evidence thus does not support a finding that the County's policies caused Turner's deprivations.

Turner cannot rely upon gaps in the County's policies for similar reasons. Turner complains that the County failed to act upon his repeated grievances and the court orders filed late in 2015 and attributes this failure to inadequate policies for following up on such requests and orders. It is true that "in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Glisson*, 849 F.3d at 381. However, Turner's arguments are again unavailing, because he cannot show that a different policy would have led to faster treatment. Nor does he show how the delay in his own treatment was an obvious consequence of the County's actions. As discussed above, all the evidence shows

that the County's administrators were diligent in contacting the clinic to ensure that Turner had appointments with the clinic's doctors. They were responsive to his grievances and to the court's orders. That record precludes any finding of an actionable gap in the County's policies.

Finally, Turner cannot claim liability against Cook County on the ground that Mennella and Feldman were final policymakers whose actions led to a constitutional deprivation. A county can be liable under the final policymaker theory only if we are dealing with a real policymaker and that policymaker acted "with deliberate indifference as to [the] known – or obvious consequences" of her conduct. *Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997) (quotation marks omitted); see also *Doe v. Vigo Cnty., Ind.*, 905 F.3d 1038, 1045 (7th Cir. 2018). It is not at all clear that either Mennella or Feldman meets the criteria for a final policymaker. See, *e.g.*, *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780–81 (7th Cir. 2011). But, like the district court, we do not need to resolve that issue here. Turner has pointed to no evidence showing that Mennella and Feldman were deliberately indifferent to his medical needs. Turner has not even provided enough evidence to conclude that they acted unreasonably. Thus, Turner's argument based on the final policymaker theory also fails.

Because all of Turner's arguments to the contrary are unavailing, the district court properly granted summary judgment in the County's favor on Turner's *Monell* claim.

### III

We AFFIRM the judgment of the district court.